## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ADEE HONEY FARMS; BILL RHODES HONEY COMPANY, LLC; and HACKENBERG APIARIES; | ) ) ) | |
| | ) | **Case No. 1:13-cv-02922** |
| Plaintiffs, | ) ) | |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| GROEB FARMS, INC.; HORIZON PARTNERS LTD.; and HONEY HOLDINGS 1, LTD. d/b/a HONEY SOLUTIONS. | ) ) ) ) ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiffs Adee Honey Farms; Bill Rhodes Honey Company, LLC; and Hackenberg Apiaries (collectively "Plaintiffs"), by and through their undersigned counsel, bring this Class Action Complaint against Defendants Groeb Farms, Inc. ("Groeb"), Horizon Partners, Ltd. ("Horizon"), and Honey Holdings 1, Ltd. d/b/a Honey Solutions ("Honey Solutions") (collectively "Defendants"), and allege as follows:

### I.  NATURE OF THE CASE

1.       Plaintiffs bring this action on their own behalf, and on behalf of a class of domestic beekeepers (the "Class," further defined below), against Defendants.

2.       Plaintiffs assert claims for violations of the Lanham Act, arising from the false advertising and unfair competition alleged herein, as well as for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*, ("RICO"), arising from Defendants' knowing involvement in an international scheme to purchase, package, ship, and

sell illegally imported and fraudulently labeled honey from China in order to avoid paying U.S. antidumping duties.

3.     Defendants are among the United States' largest honey producers, importers, suppliers, packers, and processors.  They compete directly with domestic beekeepers who sell honey to the same purchasers, including retailers, other packers, and industrial food processors.

4.     Defendants admitted that they fraudulently labeled the country of origin and misrepresented the contents of millions of dollars of honey imports. Thus, Defendants have engaged in unfair competition, false advertising, and a pattern of racketeering. This illegal behavior has suppressed domestic prices of honey, caused Plaintiffs and the other Class members to lose significant amounts of sales, deprived Plaintiffs and the other Class members of the benefits that they are entitled to receive from duties imposed on Chinese honey, and otherwise caused economic loss and financial harm to Plaintiffs and the other Class members.

5.     Defendants' scheme has resulted in numerous government investigations culminating in seizures of illegally imported honey, criminal indictments, significant fines, and deferred prosecution agreements.  Defendants have knowingly and intentionally purchased, packaged, distributed, and sold falsely labeled honey, and, in doing so, deceived consumers and purchasers as well as subjected those consumers and purchasers to potential health risks. Additionally, Defendants continue to harm domestic producers of honey by dumping Chinese honey into the domestic market at below fair market prices.

## II.  PARTIES

*Plaintiffs*

6.     Plaintiff Adee Honey Farms ("Adee") is a General Partnership based in South Dakota. Adee produces and sells an average of 6,000 to 8,000 barrels of honey throughout the United States each year. Adee has suffered declining sales, lost profits, loss of goodwill, lost

custom duties, and other injuries as a result of Defendants' illegal and fraudulent scheme to purchase, package, distribute, and sell illegally imported and mislabeled honey.

7.      Plaintiff Bill Rhodes Honey Company, LLC ("Rhodes") is a Florida Limited Liability Company that produces and sells an average 12,000 drums of honey throughout the United States each year. Rhodes has suffered declining sales, lost profits, loss of goodwill, lost custom duties, and other injuries as a result of Defendants' illegal and fraudulent scheme to purchase, package, distribute, and sell illegally imported and mislabeled honey.

8.      Plaintiff Hackenberg Apiaries ("Hackenberg") is a general partnership based in Pennsylvania. Hackenberg Apiaries produces and sells an average of several hundred drums of honey each year. Hackenberg has suffered declining sales, lost profits, loss of goodwill, lost custom duties, and other injuries as a result of Defendants' illegal and fraudulent scheme to purchase, package, distribute, and sell illegally imported and mislabeled honey.

*Defendants*

### A.      GROEB DEFENDANTS

9.       Defendant Groeb Farms, Inc. ("Groeb") is a Michigan corporation with its principal place of business in Onsted, Michigan.  Groeb, individually and through its agents, alter egos, subsidiaries, divisions, or parent companies, engaged and, until very recently, continued to engage in the unlawful, misleading, and fraudulent conduct alleged herein, and has affected foreign and interstate commerce in the United States, including in this District.

10.      Groeb is the world's largest industrial and foodservice processor of honey, packing approximately 85,000,000 pounds of honey annually.  According to its website, Groeb buys honey from countries around the world.  It also packs over 250,000 pounds of honey per day at its facilities in Belleview, Florida, Onstead, Michigan, and Baytown, Texas.  Groeb

markets and sells honey under several private label names including: Chef's Quality, Frosty Acres, and Market Square.

11.    In March 2010, Groeb acquired Miller's American Honey Company – a West Coast beekeeping operation with $30 million per year in honey sales.

12.    Horizon Partners, Ltd. ("Horizon") is a Wisconsin corporation with its principal place of business in Naples, Florida.  According to its website, Horizon is a private investment holding company which acquires and builds private companies in order to maximize returns on its investment.

13.    Since 1973, Groeb had been a family-owned business until Horizon acquired Groeb in 2007.  At the time Horizon acquired Groeb, Groeb was engaging in approximately $65 million dollars in honey sales per year.  Since Horizon's purchase, however, Groeb was under constant pressure by Horizon and its executives to produce more profits.

14.    Since its purchase of Groeb in 2007, Horizon has exercised actual and implied control over Groeb and the illegal scheme described herein.  Horizon used its control to commit the fraud and other illegal behavior alleged herein that caused Plaintiff's injuries.  The transshipping activities to which Groeb pled guilty all occurred after Horizon purchased and began to control Groeb.

15.    In an article from the winter/spring 2010 issue of Food and Drink magazine, the authors noted that Horizon has acted in a "leadership" capacity for Groeb, "[Groeb] was very fortunate to have been in a strong financial state as the recession hit.  In 2007, [Groeb] joined with the private equity group Horizon Partners, to further prepare itself for the future.  ***It has gained great leadership from its partners***, raising the bar for [Groeb's] future." (emphasis added).

16.     On Horizon's website, the company admits that it "participat[es] in strategic planning with portfolio company management," including Groeb.  Through this strategic planning, as well as other activities, Horizon was aware of, profited from, endorsed, and supported the illegal scheme to circumvent U.S anti-dumping laws and falsely import and fraudulently label and sell Chinese honey.

17.     As part of its deferred prosecution agreement detailed herein, Groeb "admit[ted] and agree[d]" to several facts that "establish its guilt beyond a reasonable doubt" including that "[i]n about March 2007, outside investors purchased a majority interest in GROEB FARMS and constituted a new Board of Directors *with oversight functions*."  (emphasis added).  The outside investor group with "oversight" function referred to in this agreement is Defendant Horizon.

18.     Further, Groeb admitted that the senior executives responsible for the fraudulent honey transshipping "served as management's primary point of contact to the Board of Directors and communicated directly to the Board . . . regarding GROEB FARMS' polices, positions, and practices on food safety and illegally transshipped and illegally misdeclared honey."

19.     Robert M. Feerick is the Chairman of Horizon.  Mr. Feerick is also a member of Groeb's Board of Directors.

20.     Horizon exercised its control over Groeb in such a manner as to commit fraud by knowingly, intentionally, and/or recklessly directing Groeb to purchase, package, distribute, and sell falsely labeled honey in order to increase profits for Horizon and its investors.

21.     One of the ways to know if honey is transshipped is to test the honey for different types of pollen.  To avoid this, many Chinese honey shippers will "ultra filter" their honey removing all pollen from the honey.  Ultra filtering is a high-tech procedure where honey is heated, sometimes watered down and then forced at high pressure through extremely small filters

to remove pollen.  The U.S. Food and Drug Administration states that any product that has been ultra-filtered and no longer contains pollen is not "honey," but it does not check honey to ensure that it actually contains pollen.

22.  In January 2009, after Horizon's purchase, Groeb began conducting 100 percent lot testing on all of its raw honey through a state-of-the art testing laboratory and employed specialty testing personnel to perform testing at its Florida facility.  While Groeb easily could have tested for the presence of various pollens, it chose not to do so.  Horizon knew this.

23.  A 2011 article in Food Safety News reported that Ernie Groeb, the president and CEO of Groeb, "makes no specific requirement to the pollen content of the 85 million pounds of honey his company buys.  Groeb sells retail under the Miller's brand and says he buys 100 percent pure honey, but does not 'specify nor do we require that the pollen be left in or be removed.'  He says that there are many different filtering methods used by beekeepers and honey packers.  'We buy basically what's considered raw honey. We trust good suppliers. That's what we rely on,' said Groeb, whose headquarters is in Onsted, Mich."

24.  Groeb claimed in other articles to be an industry leader and on the cutting edge in "traceability" (e.g., determining the source of the honey it imported and being able to trace the country of origin).  Groeb claimed to be completing audits of all foreign and domestic companies that provide honey to Groeb and formalizing standards with each source.  Those audits would have revealed to Horizon and the Board of Directors that Groeb was purchasing honey from China.

25.  The cost and volume at which Groeb was able to procure honey from foreign sources (including countries that had ***virtually no commercial beekeeping operations***) would also have informed Horizon that the honey Groeb was packing was transshipped.

6

26.     As Groeb expanded and profits rose, Horizon either knew or deliberately chose not to inquire further to determine that Groeb was breaking the law and fraudulently importing, packing, and re-selling illegal Chinese honey.

27.     Horizon profited from, endorsed, and supported the illegal and fraudulent transshipping scheme.  As a result of this conduct, the corporate veil must be disregarded and Horizon held liable to Plaintiffs for the damages outlined below.

28.     Groeb, through its Horizon-dominated and constituted Board, acted as an agent of and on behalf of its majority owner, Horizon, in the activities described herein.

**B.      HONEY SOLUTIONS DEFENDANT**

29.     Defendant Honey Holding I, Ltd. d/b/a Honey Solutions ("Honey Solutions") is a large industrial honey supplier structured as a Texas limited partnership with its principal place of business in Texas.

30.     Honey Solutions, individually and through its agents, alter egos, subsidiaries, divisions, or parent companies, engaged and continues to engage in the unlawful, misleading, and fraudulent conduct alleged herein, and has affected foreign and interstate commerce in the United States, including in this District.

### III.  JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1125(a).

32.     This Court has personal jurisdiction over Defendants because Defendants reside in or engage in a continuous and systematic course of doing business in this District, or have substantial contacts with, conduct and solicit business in, or derive substantial monetary benefit from their contacts with this District.

33.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendants conduct business in, have substantial contacts with, or may be found in this District. Additionally, a substantial portion of the events at issue has arisen in this District.

## IV.  FACTS

### A.  HONEY PRODUCTION

34.    Honey is the natural, sweet substance produced by honey bees from the nectar of flowering plants. The variety of honey produced by honey bees is collected by beekeepers and consumed by humans.

35.    The color of honey varies from nearly colorless to dark brown.  The consistency can be fluid, viscous, or partly to entirely crystallized.  The flavor and aroma vary, but are derived from the plant origin.

36.    Honeybees form nectar into honey by a process of regurgitation, and store it as a primary food source in wax honeycombs inside the beehive. Beekeeping practices encourage overproduction of honey so the excess can be taken from the colony without harming the bees who live in the hive and who also rely on the honey as a food source.

37.    Honey gets its sweetness from the monosaccharides fructose and glucose, and has approximately the same relative sweetness as that of granulated sugar.  It also contains other sugars as well as trace enzymes, minerals, vitamins, and amino acids.  It has attractive chemical properties for baking, and a distinctive flavor that leads some people to prefer it over sugar and other sweeteners.

38.    High-quality honey can be distinguished by fragrance, taste, and consistency. Ripe, freshly collected, high-quality honey at 20 °C (68 °F) should flow from a knife in a straight stream, without breaking into separate drops.  After falling down, the honey should form a bead.

The honey, when poured, should form small, temporary layers that disappear fairly quickly, indicating high viscosity. When honey does not behave in this manner, it indicates excessive water content (over 20%) of the product.

39. There are about 212,000 beekeepers in the United States. The U.S. Department of Agriculture (USDA) describes 200,000 of them as hobbyists, and another 10,000 as "sideliners," or part-time beekeepers. Commercial producers, those owning 300 or more colonies, number about 2,000 and produce about 60 percent of the honey extracted annually in the United States.

40. Many commercial beekeepers migrate their colonies during the year to provide pollination services to farmers and to reach the most abundant sources of nectar. Commercial beekeeping operations are frequently family businesses that are handed down from generation to generation.

41. Millions of acres of U.S. fruit, vegetable, oilseed, and legume seed crops depend on honey bee pollination. A 1999 Cornell University study concluded that the direct value of honey bee pollination annually to U.S. agriculture was $14.6 billion.

42. The USDA has estimated that 80 percent of insect crop pollination is accomplished by honey bees. Approximately one-third of the total human diet is derived directly or indirectly from insect-pollinated plants (fruits, legumes and vegetables).

43. The almond crop is entirely dependent on honey bee pollination. Without honey bees, there would be no almonds. More than 80 percent of the world's almonds are produced in California. To pollinate California's approximately 740,000 bearing acres of almonds requires more than a million colonies of honey bees.

44.     Numerous other crops are 90 percent dependent on honey bee pollination.  Some of those crops include apples, avocados, blueberries, cherries, cranberries and sunflowers.  Other crops such as cucumbers, kiwi fruit, melons and vegetables are also pollinated by honey bees.

45.     The production of most beef and dairy products consumed in the United States is dependent on insect-pollinated legumes (alfalfa, clover, etc.).  Although alfalfa hay does not require insect pollination, it is grown from seed that is entirely dependent on insect pollination.  Honey bees are among the pollinators used to pollinate alfalfa fields for seed production in California, a major source of U.S. alfalfa seed production.

## B.  HONEY IMPORTATION

46.     Honey production in 2011 from producers with five or more colonies totaled 148 million pounds, down 16 percent from 2010. Yield per colony averaged 59.6 pounds, down 9 percent from the 65.6 pounds in 2010.

47.     Because the United States consumes approximately 400 to 450 million pounds of honey each year, almost 300 million pounds of honey must be imported every year to meet consumer demand.  About 35 percent of this honey is consumed in homes, restaurants, and institutions. The remaining 65 percent is purchased by industry for use in cereals, baked goods, sauces, beverages, and hundreds of different processed foods.

48.     While honey prices in the United States typically range from $1.40 to $1.80 per pound because of high production costs, prices for honey produced in China are significantly lower. The price of honey produced in China can be as low as $.22 per pound.

49.     China's cost advantage with honey stems from its practice of harvesting or tapping honey early (before it matures) resulting in higher moisture content and poorer quality honey. Additionally, Chinese honey producers use chloramphenicol (an animal antibiotic banned

by the FDA because it can cause death or serious illness in people) to treat diseases that threaten their beehives. In 2002, after European Union (E.U.) investigators discovered several batches of Chinese honey tainted with chloramphenicol, the E.U. banned Chinese honey imports.

50.     Chinese manufacturers have been "dumping" large quantities of low-cost (and often low-quality) honey into the American market since the 1990s.  The wide discrepancies in price between domestic honey and foreign honey inhibited and continue to inhibit domestic honey producers' competitiveness.

## C.  DEPARTMENT OF COMMERCE INVESTIGATION AND SUBSEQUENT ANTIDUMPING DUTY

51.     In response to complaints from domestic honey producers that China was "dumping" honey into the American market, the United States Department of Commerce ("DOC") launched two separate investigations.  The DOC commenced its first investigation in 1994 ("First Investigation") and its second investigation in 2000 ("Second Investigation").

52.     The DOC determined, as a result of the First Investigation, that honey imported from China was being sold at less than fair value.[1]  Subsequently, the DOC entered into a suspension agreement with the Chinese government.[2]

53.     The DOC and the People's Republic of China ("PRC") entered into the Suspension Agreement "pursuant to the provisions of Section 734(l) of the Tariff Act of 1930, as amended."[3]

---

[1]     *See Honey from China (PRC)*, 60 Fed. Reg. 29,824 (June 6, 1995) (notice of preliminary critical circumstances determination).

[2]     *See Honey From the P.R.C.*, 60 Fed. Reg. 42,521 (ITA Aug. 16, 1995) (notice of suspension of investigation); Agreement Suspending the Antidumping Investigation on Honey From the P.R.C., Aug. 2, 1995, U.S.-P.R.C., reprinted in 60 Fed. Reg. at 42,522–27 ("Suspension Agreement").

[3]     19 U.S.C. § 1673c(l).

54.     Through the Suspension Agreement, the DOC "suspend[ed] its antidumping investigation with respect to honey produced in the PRC. . . ."[4]  The parties entered into the Suspension Agreement "[f]or the purpose of encouraging free and fair trade in honey, establishing more normal market relations, and preventing the suppression or undercutting of price levels of the domestic product. . . ."[5]

55.     The terms of the Suspension Agreement included providing for the establishment of export limits and a reference price.  Additionally, the Agreement required that the PRC take certain actions in order to effectively restrict the volume of honey exports to the United States, including the establishment of a quota certification program.[6]  The Suspension Agreement remained in effect from August 16, 1995 through August 16, 2000.[7]

56.     On September 29, 2000, the domestic honey industry filed a petition with the DOC and the United States International Trade Commission ("ITC"), alleging that sales of Chinese honey at below market values continued to injure the domestic honey industry.[8]  After receiving this petition, the DOC initiated its Second Investigation.[9]

---

[4]     *Suspension Agreement*, 60 Fed. Reg. at 42,522–23.

[5]     *Id.* at 42,522.

[6]     *See Suspension Agreement*, 60 Fed. Reg. at 42,523–24.

[7]     *See Termination of Suspended Antidumping Duty Investigation on Honey From the P.R.C.*, 65 Fed. Reg. 46,426 (ITA July 28, 2000) ("Termination").

[8]     *See Antidumping and Countervailing Duty Pet., Honey from Arg. and the P.R.C.,* (Sept. 29, 2000), Pub. R. Doc. 1.

[9]     *See Honey From Arg. & the P.R.C.*, 65 Fed. Reg. 65,831 (ITA Nov. 2, 2000) (notice of initiation of antidumping duty investigation).

57.     In November 2000, the ITC found reasonable indications that the domestic honey industry had been materially injured by honey imports from the PRC.[10]  On May 11, 2001, the DOC published its affirmative preliminary determination of sales at less than fair value of honey from the PRC.[11]  The DOC determined, based on findings from the Second Investigation, that honey from the PRC "is being sold, or is likely to be sold, in the United States at less than fair value."[12]  Further, the DOC assessed antidumping duty margins ranging between 25.88% and 183.80%.[13]

58.     Between 2001 and 2007, these duties imposed by the DOC reached as high as nearly 221%.  If all PRC companies had complied with payment of these duties, the United States Honey Industry should have remained competitive against the significantly lower prices of Chinese honey because the duties would have increased the price of Chinese honey to fair market value.

59.     In November of 2012, the U.S. International Trade Commission voted to keep in place existing anti-dumping duties placed on imports of honey from China, determining that removing the tariffs would likely harm the domestic industry.

### D.   TRANSHIPPING AND EFFORTS TO AVOID THE ANTIDUMPING DUTY

60.     Before the DOC imposed these duties, China was among the two largest suppliers of honey to the United States, shipping approximately 58.7 million pounds of honey to the United States annually.

---

[10]     *See Honey from Arg. & China*, 65 Fed. Reg. 69,573 (ITC Nov. 17, 2000) (notice of prelim. injury determination); *Honey from Arg. & China*, USITC Pub. No. 3369, Inv. Nos. 701-TA-402 and 731-TA-892-893 (Nov. 2000) ("ITC Preliminary Determination").

[11]     *See Prelim. Determination*, 66 Fed. Reg. at 24,101.

[12]     *Id.* at 50,608.

[13]     *See Am. Final Determination*, 66 Fed. Reg. at 63,672.

61.     The antidumping duties only temporarily limited the flow of Chinese honey into the United States. Even though "official" Chinese honey exports to the United States fell considerably after the imposition of the duties, China's honey production capacity increased.

62.     Jill Clark, Vice-President of Sales at Dutch Gold, noted, "[w]e saw a flurry of honey starting to come into the U.S. from countries – Indonesia, Malaysia, Taiwan, the Philippines – that had never been exporters to the U.S. before. . . . All of a sudden they had millions of pounds of honey to sell, at very cheap prices."[14]

63.     In 2002, Australian investigators discovered a global honey-laundering scheme when they intercepted a shipment of "Singapore" honey bound for the United States. Singapore, at the time, had no domestic honey operations. Investigators traced the shipment back to China.

64.     After the DOC imposed duties on Chinese honey, Defendants (and others) began a scheme of illegally importing honey into the United States through a process known as "transshipping."

65.     Through transshipping, instead of directly sending Chinese honey to the United States, participants in the scheme send the honey to a "transshipper" in another country where the honey is not subject to United States import duties. Once the honey reaches the foreign transshipper, participants in the scheme re-label the honey to make it appear to be the product of the transshipper's country. The transshipper then re-exports the mislabeled and disguised Chinese honey to United States importers and suppliers. This "transshipping" process illegally circumvents United States antidumping import duties and substantially harms the domestic honey industry. Below is an example of how the transshipping scheme works:

---

[14]     Jessica Leeder, *Honey laundering: The sour side of nature's golden sweetener*, THE GLOBE AND MAIL, Jan. 5, 2011, at 1.



66.     In order to enter imported goods into the United States, a company must file entry documents with the United States Department of Homeland Security, Bureau of Customs and Border Protection ("CBP").  These entry documents include CMP entry forms 3461 and 7501, which require importers to provide specific and truthful information about imported goods.

67.     In particular, the documents must describe the manufacturer and value of the imported goods, as well as their country of origin.  In order to circumvent U.S. import duties, importers of transshipped and mislabeled Chinese honey, including Defendants herein, falsified Bureau of Customs import entry documents via the wires and mail.  These entry documents include fraudulent information regarding the contents and country of origin of their honey imports.

68.     Defendants knowingly (and admittedly) engaged and transacted with importers who used foreign transshippers located in countries that are not subject to the U.S. honey import duty to cause the illegal importation of Chinese honey into the United States.[15]   These "transshipper" countries have few commercial bee operations and a very limited history—if any—of producing significant quantities of honey for export to the United States.

69.     The DOC's National Honey Report reported that, in the year 2000, India exported zero metric tons of honey into the United States.   In 2009, on the other hand, India exported 13,137 metric tons of honey into the United States; this number had been steadily increasing since the DOC imposed import duties on Chinese honey.[16]   Additionally, Malaysia also exported 9,068 metric tons of honey in 2009, compared with zero metric tons in 2000.[17]

70.     Richard Pasco, writing on behalf of the Honest Honey Initiative, noted:

[i]ncreasingly sophisticated honey import schemes are creating drastically diverging market prices. There is now one price for legitimate honey and another rock bottom price (which is sometimes available at ½ (sic) the cost of legitimate honey) for transshipped honey. This trade makes it almost impossible for honey packers who refuse to purchase this transshipped product to compete against those who are engaged in this activity. Additionally, the unfair competition is detrimental to the legitimate honey importer segment of the honey industry.[18]

---

[15]     Between January 2002 and January 2009, honey originating in Russia, India, Indonesia, Malaysia, Mongolia, Philippines, South Korea, Taiwan, and Thailand was not subject to antidumping duties.

[16]     For example, India imported 20 metric tons of honey in 2001, 2,465 metric tons in 2002, 4,645 metric tons in 2003, and so on.   *See* Exhibit I: U.S. Honey Import Data, from Richard Adee, Statement of American Honey Producers Association, Hearing on "Enforcing America's Trade Laws in the Face of Customs Fraud and Duty Evasion," United States Senate Committee on Finance, Subcommittee on International Trade, Customs, and Global Competitiveness (May 5, 2011).

[17]     Honey Laundering, CPO Rising (Aug. 16, 2011), *available at* http://cporising.com/2011/08/16/honey-laundering/.

[18]     Richard Pasco, "What Transshipped Honey is Doing to the U.S. Honey Market and What You can Do About It!," *Catch the Buzz*, Feb. 2, 2010, *available at* http://home.ezezine.com/1636/1636-2010.02.02.12.53.archive.html

71.     Additionally, Defendants knowingly and intentionally purchase, package, distribute, and sell illegally imported [transshipped] Chinese honey containing antibiotics, including the antibiotic chloramphenicol, which have been banned in the United States.

72.     Defendants are also aware that this illegally imported Chinese honey is also heavily adulterated, containing inexpensive sweeteners and sometimes blended with high fructose corn syrup and other additives, despite the fact that importers, in league with Defendants, represent that it is pure honey.

73.     In June 2010, the E.U. banned imports of honey from India because it found at least two antibiotics and high traces of lead in almost a quarter of tested shipments. Additionally, most honey importers who were shipping Indian honey could not prove that the honey was produced in India (and not produced in China).   European investigators also discovered that large amounts of this so-called "honey" imported from India had been produced without the help of bees, but instead had been made from artificial sweeteners and then extensively filtered to remove any proof of the "honey's" non-bee origin.[19]

74.     Defendants know that the importers they transact with have succeeded in avoiding U.S. import duties, bringing massive volumes of Chinese honey into the United States market at below fair value prices before Defendants purchase, package, distribute, and sell this illegally imported, adulterated honey in the United States.  Between 2008 and 2010, illegal transshipping cost the United States government approximately $200 million dollars in uncollected import duties.

---

[19]     Andrew Schneider, Asian Honey, Banned in Europe, Is Flooding U.S. Grocery Shelves, *Food Safety News* (Aug. 15, 2011) available at http://www.foodsafetynews.com/2011/08/honey-laundering/.

75.     In November 2011, Food Safety News purchased more than 60 jars, jugs, and plastic bears of honey in ten states and the District of Columbia. Vaughn Bryant, one of the nation's premier melissopalynologists (investigators of pollen in honey) tested the containers for traces of pollen.  The test results revealed that 76 percent of honey samples purchased at groceries had all of the pollen removed; 100 percent of the honey sampled from drugstores had no pollen; and 77 percent of honey sampled from big box stores had the pollen filtered out.[20]

76.     Although some packers suggest that groceries prefer processed honey over unfiltered honey because it lasts longer on the shelves, most beekeepers note that traditional filtering will catch bee parts, wax and debris, but will leave the pollen in place.[21]

77.     "In my judgment it is pretty safe to assume that any ultra-filtered honey on store shelves is Chinese honey and it's even safer to assume that it entered the country uninspected and in violation of federal law," said Mark Jensen, president of the American Honey Producers Association.[22]

78.     In fact, elimination of all pollen can only be achieved by ultra-filtration.  Ultra-filtration is expensive and serves only to diminish the quality of the honey.

79.     As alleged herein, Defendants knowingly and intentionally purchased, packaged, distributed, and sold adulterated, ultra-filtered Chinese honey that they claimed to be domestic "honey."   Not only was it not *U.S. produced* honey; it was often not even honey.

---

[20]     Andrew Schneider, Tests Show Most Store Honey Isn't Honey, *Food Safety News*, Nov. 07, 2011, available at http://www.foodsafetynews.com/2011/11/tests-show-most-store-honey-isnt-honey/.

[21]     *Id.*

[22]     *Id.*

### E. HONEYGATE PHASE 1 – SUPPLY SIDE

80.     Beginning in 2008, federal authorities, led by the U.S. Immigration and Customs Enforcement's Home Security Investigations, initiated a phased investigation known as "Honeygate."

81.     The initial phase focused on the "supply side" of the honey industry, concerning businesses' and individuals' avoidance of antidumping duties through illegal imports, including transshipment and mislabeling.

82.     As a result of the first phase of the investigation, the United States government brought charges against fourteen individuals, including executives of Alfred L. Wolff GmbH and affiliated companies for avoiding approximately $80 million in antidumping duties on Chinese honey.

83.     In February 2008, United States Customs agents tested samples taken from nine seized shipping containers full of honey that were being held for distribution by ALW Food Group. [23]

84.     The tests revealed that the honey in the seized containers originated in China, despite ALW Food Group's accompanying paperwork that claimed that the honey originated in Russia.[24]

85.     In March 2008, Stefanie Giesselbach and Magnus Von Buddenbrock, two AWL Food Group employees, were charged with conspiring to import the Chinese product into the United States using documents that falsified the true country of origin of the product, violating 18 USC §§ 371, 545 and 21 USC §§ 331(a), 333(a)(2).

---

[23]     Andrew Schneider, *Honey Laundering: A Sticky Trail of Intrigue and Crime*, SEATTLE POST-INTELLIGENCER, December 30, 2008, *available at* http://www.seattlepi.com/local/394053_honey30.asp.

[24]     *Id.*

86.     Giesselbach admitted that the seized Chinese product had been transshipped to the United States through Russia and was accompanied with falsified paperwork for the purpose of avoiding higher import duties applicable to Chinese honey and testing.[25]

87.     In 2008, Giesselbach estimated that the ALW Food Group Co. had imported millions of dollars in re-labeled honey "in the past three years."[26]

88.     Giesselbach and Buddenbrock together with another defendant, Yan Yong Xiang, cooperated with the U.S. government's investigation of ALW Food Group. Each described a conspiracy to import honey in violation of United States statues and regulations in order to avoid applicable antidumping duties.[27]

89.     Two years later, in September 2010, Patrick Fitzgerald, U.S. Attorney for the Northern District of Illinois, issued a 70-page indictment charging eleven Chinese and German Executives, ALW USA, ALW Germany, and other ALW companies, with "conspiring to import more than $40 million of Chinese honey to avoid paying anti-dumping duties of approximately $80 million."[28]

90.     The indictment set forth a conspiracy that began in or about January 2002 and that continued until in or about January 2009 in Chicago, Illinois, among other locations.   The Department of Justice described *United States v. Wolff* as the nations' largest antidumping and

---

[25]     *Id*.

[26]     *Id*.

[27]     Press Release, UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, *11 Individuals, 6 companies indicted for alleged global conspiracy to illegally import Chinese honey,* (Sept. 1, 2010), *available at* http://www.ice.gov/news/releases/1009/100901chicago.htm.

[28]     *11 Execs, 6 Foreign Firms Caught in Honey Sting*, AOL NEWS, Sept. 2, 2010, *available at* http://www.aolnews.com/2010/09/02/11-execs-6-foreign-firms-caught-in-huge-honey-sting/.

"'food fraud' criminal prosecution."[29] The investigation uncovered 600 loads of mislabeled Chinese honey that bypassed nearly $80,000,000.00 in United States import duties.[30]

91.     As alleged herein, Defendants knowingly and intentionally purchased, packaged, distributed, and sold illegally imported, transshipped honey from ALW Food Group and related entities which were subject to the government's indictment described above.

92.     Indeed, after ICE seized transshipped honey from ALW Food Group, Groeb sued ALW because the honey had been destined for Groeb.

### F.  HONEYGATE – PHASE 2 – DEMAND SIDE

93.     The second phase of the Honeygate investigation focused on the "demand side" of the honey industry, particularly the illegal purchasing, processing and trading of honey that illegally entered the United States.[31]

94.     This phase resulted in charges brought against two companies, Defendants Groeb and Honey Solutions, and five individuals for their roles in avoiding more than $180 million in antidumping duties on Chinese honey.[32]

95.     As Immigration and Customs Enforcement Deputy Director Daniel Ragsdale explained, Groeb and Honey Solutions implemented the herein described schemes which not only "intentionally deprived the U.S. Government of millions of dollars in unpaid duties" but

---

[29]     Statement of American Honey Producers Association to Committee on Finance, Subcommittee on International Trade, Customs, and Global Competitiveness, United States Senate (May 5, 2011), *available at* http://finance.senate.gov/imo/media/doc/050511ratest.pdf.

[30]     Press Release, UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT, *11 Individuals, 6 companies indicted for alleged global conspiracy to illegally import Chinese honey,* (Sept. 1, 2010), *available at* http://www.ice.gov/news/releases/1009/100901chicago.htm.

[31]     Press Release, Dep't of Justice, Two Companies and Five Individuals Charged with Roles in Illegal Honey Imports, Avoided $180 Million in AntiDumping Duties 1 (February 20, 2013), *available at* http://www.justice.gov/usao/iln/pr/chicago/2013/pr0220_02.html.

[32]     Press Release, Two Companies at 1.

also resulted "in legitimate importers and the domestic honey-producing industry enduring years of unprofitable operations, with some even being put out of business."[33] Plaintiffs and the other Class members herein are the domestic honey-producing industry.

96.     In the second phase of "Honeygate," Groeb, the largest industrial honey supplier and packer in the United States, was charged with purchasing 1,578 containers of Chinese-origin honey between February 2008 and April 2012, "knowing that it was illegally imported into the United States to avoid more than $78.8 million in antidumping duties."[34] Groeb entered into a deferred prosecution agreement, wherein it accepted responsibility for its conduct and that of its current and former employees.[35] Groeb also agreed to pay a $2 million fine, fully cooperate for two years, and destroy all illegal Chinese-origin honey in its possession. As the United States Attorney's Office set forth:

> The company admitted in a factual statement that two former executives purchased Chinese-origin honey for processing at its facilities and sold that honey to its domestic, retail, foodservice, and industrial customers as mislabeled non-Chinese honey, and at other times, as Chinese honey, all while knowing that it had been illegally imported to avoid antidumping duties and, at times, honey assessment fees. The honey was variously described falsely as sugars and syrups instead of Chinese-origin honey, and as having originated in Indonesia, Malaysia, Mongolia, Thailand, and Vietnam, instead of China.[36]

97.     Moreover, two former Groeb executives [identified in the Government's information as "Executive A" and "Executive B"] provided false information to customers and

---

[33]     Press Release, Two Companies at 2.

[34]     Press Release, Two Companies at 2.

[35]     Press Release, Two Companies at 2.

[36]     Press Release, Two Companies at 2. In 1995, five Groeb employees, including then-CEO Ernest L. Groeb, were indicted by the Department of Justice for blending corn syrup with their honey and then selling the adulterated honey as "pure" or USDA Grade A Honey. Press Release, Dep't of Justice, Five Persons Indicted in Honey Adulteration Conspiracy 1 (January 27, 1995), *available at* http://www.justice.gov/opa/pr/Pre_96/January95/47.txt.html.

the public regarding the company's involvement in the knowing purchasing, processing, and selling of illegal Chinese-origin honey.[37]   As the United States Attorney's Office found, "[t]he two former executives engaged in fraudulent practices despite the company's own audits and inspections that raised substantial concerns that the honey was illegally imported."[38]

98.    As part of its deferred prosecution agreement, Groeb admitted the following facts:

- Beginning no later than February 2008 and continuing until about April 2012, GROEB FARMS, as part of a fraudulent practice, received, bought, sold, and facilitated the transportation, concealment, and sale of merchandise, namely, at least approximately 1,578 container loads of Chinese-origin honey knowing the same to have been imported and brought into the United States contrary to law, namely, as part of a fraudulent practice in violation of Title 18, United States Code, Section 542, all in violation of Title 18, United States Code, Section 545.

- As part of the fraudulent practice, GROEB FARMS, acting through Executive A and Executive B, purchased Chinese-origin honey for processing at its facilities and sold that honey to its domestic customers as mislabeled non-Chinese honey, and at other times as Chinese honey, all while knowing that the honey had been falsely and fraudulently imported and entered into the United States in avoidance

---

[37]     Press Release, Two Companies at 2.

[38]     Press Release, Two Companies at 2.  Executive A, a senior Groeb executive, reported directly to Groeb's Board of Directors and "exercised control, authority, responsibility, and supervision over Groeb, including its operations and executive management team." *United States v. Groeb Farms, Inc*., Case No. 13 CR 0137, at 4 (information) (N.D. Ill. Feb. 12, 2013) ("Groeb information").  Executive A also communicated directly with Groeb's Board of Directors, its customers and the public concerning Groeb's policies and practices on food safety as well as illegally "transshipped and illegally misdeclared honey." *Id.* Executive B reported directly to Executive A and exercised, control, authority, responsibility and supervision over honey purchasing on behalf of Groeb. *Id.*

of U.S.-imposed antidumping duties and at times, honey assessment fees, including in the following means:

a.  falsely and fraudulently declaring Chinese-origin honey as having originated from countries other than China, including Indonesia, Malaysia, Mongolia, Thailand, and Vietnam; and

b.  falsely and fraudulently describing Chinese-origin honey as a product other than honey, including sugars and syrups.

- Beginning in or about 2008 and continuing through in or about 2012, GROEB FARMS instituted first-party onsite supply chain audits and inspections of manufacturers and suppliers. As part of the fraudulent practice, Executive A and Executive B:

a.  continued to deliberately purchase honey from U.S.-based brokers receiving honey from Asian suppliers, including Suppliers 1, 2, 3, and 4, even after the audits raised substantial concerns that these overseas suppliers were providing GROEB FARMS with illegally transshipped and misdeclared Chinese-origin honey;

b.  continued to deliberately purchase honey from another U.S.-based broker receiving honey from another Asian supplier, Supplier 5, even after GROEB FARMS was refused access to Supplier 5's facilities to conduct onsite supply chain audits and inspections; and

c.  marketed and promoted GROEB FARMS' compliance with applicable laws, including its first-party supply chain audits and inspections, to customers and the public.

- As part of the fraudulent practice, GROEB FARMS, acting through Executive A and Executive B, knowingly obtained and caused others at GROEB FARMS to receive fake and fraudulent bills of lading, invoices, packing lists, country of origin certificates, and other papers, which records had been used to falsely and fraudulently declare Chinese-origin honey as having originated from countries other than China and at times, as sugars and syrups.

- As part of the fraudulent practice, GROEB FARMS, acting through Executive A and Executive B, provided false, fraudulent, and misleading representations to GROEB FARMS' (a) Board of Directors; (b) customers; and (c) the public regarding GROEB FARMS' involvement and participation in the knowing purchase, receipt, processing, mislabeling, and sale of Chinese-origin honey that falsely and fraudulently entered the United States in avoidance of U.S. imposed antidumping duties and at times, honey assessment fees, and in so doing:

  a. maintained a corporate website containing false and fraudulent representations about its lack of involvement in illegal transshipping and customs fraud-related matters; and

  b. communicated by email and mass marketing material in furtherance of its fraudulent practices.

- As part of the fraudulent practice, GROEB FARMS and others, including Executive A and Executive B, misrepresented, concealed, and hid, and caused to be misrepresented, concealed, and hidden, the acts and the purposes of the acts done in furtherance of the their criminal activities.

- For the period from in or about February 2008 and continuing until about April 2012, as part of the fraudulent practice, GROEB FARMS caused losses to the United States of no less than $78,866,216.

99. As indicated above, despite the fact that it is common knowledge among those in the honey industry that India, Vietnam, Malaysia, and other countries send large quantities of transshipped honey, Groeb maintains an inventory of honey labeled "products of India." Additionally, Groeb's stocks include barrels of honey labeled "Vietnam" and "Malaysia."

100. Groeb has used, on many occasions, suppliers that have been indicted for transshipping Chinese honey, including ALW USA.

101. Groeb had a longstanding commercial relationship with ALW USA as one of ALW's honey customers. The parties entered into at least 25 contracts for honey deliveries between September 2005 and September 2008.[39]

102. Groeb knew that many shipments it received of Indian-origin, Malaysian-origin, and Vietnamese-origin honey were actually mislabeled and illegal Chinese-origin honey. Groeb

---

[39] *Groeb Farms, Inc. v. Alfred L. Wolff, Inc.*, No. 08-CV-14624 (E.D. Mich. March 20, 2009) (defendant/counter-plaintiff's combined motion and brief to stay proceedings). On September 5, 2008, Groeb filed an action against ALW USA alleging breach of contract, fraud and misrepresentation for failing to deliver Korean-origin and Indian-origin honey to its farm in Onsted, Michigan. ALW USA failed to deliver the honey because the Department of Homeland Security refused to allow the shipments (ALW USA was attempting to ship Chinese-origin honey). The total value of the non-delivered shipments was $2,857,609.88. *Groeb Farms, Inc. v. Alfred L. Wolff, Inc.*, 2009 WL 500816 (E.D.Mich. Feb. 27, 2009) (opinion and order granting in part and denying in part defendant's motion to dismiss plaintiff's complaint pursuant to fed. r. civ. P. 12(b)(6)). When Groeb contracted with ALW USA to purchase honey, Groeb agreed to the following language: "IN EVENT OF FDA/USDA/CUSTOMS REJECTION OR NON-SHIPMENT BY ORIGINAL VENDOR OF ALL OR PART OF GOODS REPRESENTED IN THIS SALE, SELLER DOES NOT GUARANTEE REPLACEMENT. […]" *Groeb Farms, Inc,* 2009 WL 500816 at 2.

had a consistent practice of dealing with companies and individuals known to illegally transship Chinese-origin honey.[40]

103.    Groeb purchased transshipped honey from ALW USA and then sold that same honey to distributors using a false designation of the honey's origin. Additionally, Groeb knew or at least had reason to know that honey Groeb purchased from ALW USA was illegally transshipped from China. Groeb accepted shipments from known transshipper countries and failed to inspect shipments to ensure that they were legally obtained.

104.    Rolf Richter, Groeb's Chief Executive Officer has stated that "[we] take full responsibility for and deeply regret any errors that were made in the past regarding the import of honey."[41]

105.    In June 2011, during the second phase of the Honeygate investigation, an undercover agent took the role of director of procurement at Honey Solutions. This investigation resulted in charges brought against Honey Solutions as well as five individuals for their roles in avoiding antidumping duties.[42]

---

[40]    On Nov. 18, 2011, Chin Shih Chou (President of Fina Food Trading, Inc.), Qiao Chu (Secretary/manager and "unique agent-in-charge" of Demeter Group, Inc.), and Wei Tang Lo, were indicted in the in the Middle District of Florida on that grounds that they "knowingly and willfully and with intent to defraud the United States, did smuggle and clandestinely introduce into the United States merchandise which should have been invoiced; that is, honey with a country of origin of China, of an approximate value exceeding $1 million." *United States v. Chin Shih Chou, et al.*, Case No. 3:11-cr-286-J-34TEM, indictment, at 1 (M.D.Fla. Nov. 18, 2011). As referenced in the criminal complaint, the warehouse manager positively identified 29 bills of lading as the shipments received into the warehouse as "Rice Syrup." The warehouse manager then also positively identified another 29 Bills of Lading as the ones that Wei Tang Lo produced to the truck drivers as they came to pick up the barrels. Wei Tang Lo had given one copy of the Bills of Lading to the warehouse and another, inconsistent, copy to the truck drivers. The bills indicated the commodities as "Drums of Honey" and "Honey Drums." Groeb was listed as a consignee on the Bills of Lading that Wei Tang Lo handed to the truck drivers. *Id.* at 22 -23.

[41]    Phil Mattingly, *Honey Sting Leads to U.S. Charges of Smuggling from China*, BLOOMBERG, Feb. 20, 2013, *available at* http://www.bloomberg.com/news/2013-02-20/u-s-probe-nets-largest-honey-smuggling-scheme-in-history.html.

[42]    Press Release, Two Companies at 1.

106.    Douglas A. Murphy and Honey Solutions were charged together with violating the federal Food, Drug, and Cosmetic Act for purchasing "discounted Polish-origin honey containing the prohibited antibiotic Chloramphenicol from Alfred L. Wolff USA in 2006."[43] From 2003 to 2008, Douglas A. Murphy was Director of Sales for Honey Solutions and was responsible for purchasing wholesale quantities of honey, maintaining wholesale supplier relationships and the sale of honey to U.S. customers, including industrial end users.[44]

107.    Like Groeb, Honey Solutions entered into a deferred prosecution agreement, wherein it accepted responsibility for its conduct and that of its former employees and agents. Honey Solutions must pay a $1 million fine and fully cooperate for two years.[45]    Honey Solutions admitted to defrauding its downstream customers of approximately $26,624 by purchasing, processing and selling Polish honey adulterated with the antibiotic Chloramphenicol.[46]    Honey Solutions also admitted to purchasing Chinese-origin honey from at least "seven shell and front companies that were controlled by various Chinese honey producers and manufacturers," allowing the avoidance of more than $33.4 million in antidumping duties.[47]

108.    As part of its deferred prosecution agreement, Honey Solutions stated that it "admits and agrees that on or about December 11, 2006, at Chicago, in the Northern District of Illinois, Eastern Division, HONEY HOLDING, with intent to defraud and mislead, did cause to be introduced and delivered for introduction, into interstate commerce, articles of food intended for human consumption, that is, honey from HONEY HOLDING's purchase order 461 (Alfred

---

[43]    Press Release, Two Companies at 2.

[44]    Press Release, Two Companies at 2.

[45]    Press Release, Two Companies at 3.

[46]    Press Release, Two Companies at 3.

[47]    Press Release, Two Companies at 3.

L. Wolff, Inc.'s purchase order 995) that was adulterated within the meaning of Title 21, United States Code, Section 342(a)(2)(C)(i), in that the honey contained an unsafe food additive, that is, Chloramphenicol, an antibiotic not authorized in honey, by authorizing the purchase and delivery of the adulterated honey, which arrived at HONEY HOLDING's facility in Baytown, Texas on or about December 14, 2006, in violation of Title 21, United States Code, Sections 331(a), 333(a)(2), 348(a), and Title 18, United States Code, Section 2."

109. Further, Honey Solutions admitted the following facts:

- HONEY HOLDING was a large industrial honey supplier in the United States, with its principal place of business in Baytown, Texas.

- Douglas A. Murphy was Director of Sales at HONEY HOLDING and between in or about 2003 and May 2008, was responsible for the purchase of wholesale quantities of honey, maintaining relationships with wholesale honey suppliers, and the sale of honey to United States customers, including industrial end users. At all times material to this Agreement, Murphy was acting within the scope of his employment, with intent to benefit HONEY HOLDING, and in the course of the discharge of his duties.

- Alfred L. Wolff GmbH ("ALW Germany") was a German international trading company headquartered and with its principal place of business in Hamburg, Germany, that purchased, imported, exported, distributed, sold, and processed food products, including honey. ALW Germany had subsidiaries, affiliates, and representative offices located throughout the world (collectively "ALW Food Group"), including Alfred L. Wolff, Inc. in Chicago, Illinois ("ALW USA").

- On or about November 19, 2006, ALW USA filed and caused to be filed CBP entry forms 3461 and 7501 for the three container loads of Polish-origin honey from purchase order 995, one container of which was adulterated with Chloramphenicol at a level of 0.6 parts per billion.

- Thereafter, Murphy caused HONEY HOLDING to issue purchase order 461 and in doing so, agreed to purchase from ALW Food Group the adulterated container of honey from ALW Food Group's purchase order 995 at a discounted price of 65 cents per pound, with the price reflecting duties paid and delivery to Texas, and did so knowing that the honey was adulterated with Chloramphenicol. HONEY HOLDING intended to introduce the adulterated honey into the stream of commerce of the United States knowing that the honey was adulterated with Chloramphenicol and intended to conceal from HONEY HOLDING's customers and government authorities that the honey was so adulterated. In fact, HONEY HOLDING sold the adulterated honey to customers without disclosing its adulterated nature and by falsely representing that it did not contain a prohibited antibiotic.

- As a result of this scheme, HONEY HOLDING, defrauded HONEY HOLDING's downstream customers of approximately $26,624 in that adulterated honey from purchase order 461 processed and sold by HONEY HOLDING at the direction of Murphy had no value, yet was sold and delivered to HONEY HOLDING's customers.

- In addition to the foregoing, HONEY HOLDING admits and agrees that the following conduct constitutes relevant conduct under United States Sentencing Guidelines §1Bl.3 and is expressly included as part of this Factual Statement:

- Urbain Tran was an agent of HONEY HOLDING's since about 2006 whose primary responsibility was to locate, arrange, and source honey for HONEY HOLDING. Despite HONEY HOLDING's written policies to the contrary, Tran brokered transactions in which HONEY HOLDING purchased Chinese-origin honey from at least seven shell and front companies that were controlled by Chinese honey producers and manufacturers, including "Chinese Transshipper 1," "Chinese Transshipper 2," and "Chinese Transshipper 3." These shell and front companies included AHCOF USA Inc.; Bo Bay Corporation; Chengda Trading Limited; Glory Spring Enterprise Co., Ltd.; Pineco Import/Export Ltd.; Silver Spoon Int'l Inc.; and Sweet Campo Co., Ltd. At all times material to this Agreement, Tran was acting within the scope of his agency relationship, with intent to benefit himself and HONEY HOLDING, and in the course of the discharge of his duties.

- Sweet Campo Co. Ltd. was a shell import company controlled by Chinese Transshipper 1 to falsely and fraudulently import and enter Chinese-origin honey into the United States without paying antidumping duties and at times, honey assessment fees, which honey Sweet Campo sold to HONEY HOLDING through transactions brokered by Tran.

- Between about 2007 and in or around June 2011, after which time, and with the consent and cooperation of HONEY HOLDING, an undercover law enforcement

agent was placed into HONEY HOLDING as its Director of Procurement, Tran, as part of a fraudulent practice to enter and introduce and cause others to enter and introduce and attempt to enter and introduce Chinese origin honey into the commerce of the United States in avoidance of U.S.-imposed antidumping duties and at times, honey assessment fees, arranged for HONEY HOLDING to purchase from at least seven shell and front companies, hundreds of shipping containers of Chinese-origin honey valued at approximately $12,319,201, even though Tran knew that the honey was falsely and fraudulently imported, entered, marketed and sold as non-Chinese honey and at other times, as sugars and syrups, which fraudulent practice caused losses to the United States of approximately $33,403,125.

- As part of the fraudulent practice, Tran obtained and caused others at HONEY HOLDING to receive fake and fraudulent bills of lading, invoices, packing lists, country of origin certificates, and other papers, which Tran knew to be fake and fraudulent and which records had been used to falsely and fraudulently declare Chinese-origin honey as having originated from countries other than China, including Cambodia, Malaysia, Mongolia, Russia, and Vietnam, and at times, as sugars and syrups, and coordinated with freight forwarding companies to cause hundreds of shipping containers of fraudulently entered Chinese-origin honey to be delivered to HONEY HOLDING.

- As part of the fraudulent practice, between about 2009 and 2012, Tran accepted approximately $330,941 in undisclosed payments from Chinese honey producers and manufacturers in exchange for TRAN brokering transactions with their

companies while knowing these producers and manufacturers were illegally transshipping and illegally misdeclaring Chinese-origin honey that was being purchased by HONEY HOLDING.

- As part of the fraudulent practice, Tran communicated by email and telephone with others, including in the Northern District of Illinois, in furtherance of HONEY HOLDING purchasing and receiving illegally misdeclared Chinese origin honey that avoided U.S.-imposed antidumping duties and honey assessment fees.

110.    The "demand side" of the Honeygate investigation also resulted in charges brought against Jun Yang and Urbain Tran, both linked to Honey Solutions, arising from their respective roles in avoiding antidumping duties.[48]   Jun Yang brokered the sale of "illegal Chinese-origin honey" to Honey Solutions, which was misrepresented as Indian-origin honey in order to avoid antidumping duties.[49]

111.    Yang also admitted responsibility for fraudulently avoiding antidumping duties on Chinese-origin honey that entered the country illegally as Malaysian and Indian honey between 2009 and 2012.[50]   Urbain Tran, an agent of Honey Solutions, brokered honey transactions for the company since 2006 and was charged "with two counts of brokering the sale and transportation of illegal Chinese-origin honey, which was misrepresented as originating in Malaysia and Vietnam, into the United States to avoid antidumping duties."[51]

---

[48]     Press Release, Two Companies at 3.

[49]     Press Release, Two Companies at 3.

[50]     Press Release, Two Companies at 3.

[51]     Press Release, Two Companies at 3.

112.     As a result of the foregoing illegal acts and practices by Defendants, and other similar practices not yet admitted, Plaintiffs and the other Class members were wrongfully deprived of the opportunity to sell their domestically produced and honestly labeled honey to retail and industry customers and, furthermore, the price of honey in the United States was unlawfully suppressed, causing Plaintiffs and the other Class members significant monetary damages.  Additionally, Plaintiffs and the other Class members were deprived of duties which would have been owed to them.

## V.  CLASS ACTION ALLEGATIONS

113.     Plaintiffs bring this action individually and pursuant to Rules 23(a) and (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of a proposed class (the "Class") defined as:

> all individuals and entities with commercial beekeeping operations (300 or more hives) that produced and sold honey in the United States during the period from 2001 to the present.

Excluded from the Class are Defendants, their co-conspirators, and their respective parents, subsidiaries and affiliates, as well as any government entities including the Court and its staff.

114.     Plaintiffs reserve the right to amend the class definition prior to class certification.

115.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that at least several thousand domestic bee keepers competed with Defendants.

116.     Plaintiffs' claims are typical of the claims of other members of the Class. Plaintiffs and the other Class members sustained damages arising out of Defendants' course of conduct in violation of laws as alleged herein.  The injuries and damages of each member of the

Class were directly caused by Defendants' wrongful conduct in violation of the federal statutes alleged herein.

117.    Plaintiffs will fairly and adequately protect the interests of the other Class members and have retained counsel competent and experienced in class action litigation.

118.    Common questions of law and fact exist as to all Class members that predominate over any questions affecting solely individual Class members.  Among the questions of law and fact common to the Class are:

  a.   Whether Defendants transshipped honey that was brought into the United States;

  b.   The duration and extent of Defendants' transshipping activities;

  c.   The extent Defendants' transshipping activities unlawfully suppressed domestic honey prices;

  d.   Whether Defendants' activities violated the Lanham Act;

  e.   Whether Defendants' activities violated RICO;

  f.   Whether Defendants' conduct, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the other members of the Class; and

  g.   The appropriate measure of damages sustained by Plaintiffs and the other members of the Class.

119.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.  The prosecution of separate actions by individual Class members would impose heavy burdens upon the courts and Defendants, and would create the risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would

achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

120.    The interest of Class members in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  The amounts at stake for Class members, while substantial in the aggregate, are not great enough to individually enable them to maintain separate suits against Defendants.  Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

121.    Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

## VI.    FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

122.    Because Defendants kept their fraudulent activities secret until they were recently prosecuted, Plaintiffs and the other Class members were unaware of Defendants' unlawful conduct and the manner in which that conduct affected them.

123.    Defendants' affirmative acts alleged herein, including acts in furtherance of their unlawful scheme, were wrongfully concealed and carried out in a manner that precluded detection.

124.    Defendants' unlawful transshipping activities were inherently self-concealing because they involved mislabeling honey and falsifying Customs documents.  If Defendants had been open and notorious about their fraudulent transshipping and mislabeling of honey, their scheme would have never succeeded.

36

125.     Defendants conducted their activities in secret. They limited communications mostly to the confines of higher-level executives so as to avoid prosecution and seizure of their illegal honey.

126.     Plaintiffs and the other Class members could not have discovered the alleged unlawful activities at an earlier date by the exercise of reasonable diligence because Defendants and their co-conspirators employed deceptive practices and techniques of secrecy to avoid detection of their activities.  Defendants fraudulently concealed their activities by various means and methods, including misrepresentations to customs officials and on shipping labels.

127.     Because Defendants affirmatively concealed their scheme, Plaintiffs and the other Class members had no knowledge until recently of the alleged fraudulent activities or of information which would have caused a reasonably diligent person to investigate whether Defendants committed the tortious and other actionable activities detailed herein.

128.     As a result of Defendants' fraudulent concealment of their activities, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the other Class members have as a result of the illegal conduct alleged in this Complaint.

## VII.  CLAIMS ALLEGED

### COUNT I
### VIOLATION OF THE LANHAM ACT – FALSE ADVERTISING
### (15 U.S.C. § 1125(a))

129.     Plaintiffs repeat and re-allege paragraphs 1-128 of this Complaint as if fully set forth herein.

130.     Each Defendant in this action, in connection with goods, namely honey, used in commerce false designations of origin, false or misleading descriptions of fact, and/or false or misleading representations of fact which were likely to cause and did cause confusion and

mistake. Additionally, Defendants' representations deceived consumers and other purchasers as to the origin, sponsorship, and approval of their goods.

131.    Actual and potential purchasers believed that each Defendant was offering honey products of the same quality and origin as Plaintiffs' and other Class members' products, but at a substantial discount. However, each Defendant was offering, in fact, inferior Chinese products that had been mislabeled with a different country of origin.

132.    Defendants sold the unmarked or mismarked products to customers in the United States without disclosing the actual origin of the goods.

133.    Because the goods were unmarked or mismarked, Defendants caused customer confusion regarding the origin of the honey products.

134.    The United States Food and Drug Administration ("FDA") enforces the provisions of the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301, *et seq.*, to ensure that foods are safe, wholesome, sanitary, and properly labeled.

135.    The FDCA prohibits the delivery and introduction of "adulterated food" into interstate commerce.

136.    Food is considered "adulterated" if, among other reasons, it contains "food additives," including the antibiotics Ciprofloxacin, Norfloxacin (from the Fluoroquinolone family), Chloramphenicol, and Furazolidon, all of which the FDCA deems "unsafe."

137.    The FDA also defines honey as containing pollen.

138.    In addition to mislabeling the country of origin of the transshipped honey they imported and sold, Defendants also delivered adulterated honey into interstate commerce, in violation of FDCA regulations.

139.    Defendants caused customers to purchase and consume adulterated honey, without those customers' knowledge or awareness.

140.    In addition, Defendants also delivered ultra filtered, pollen-free "honey" into interstate commerce, marked and labeled as "honey" when it was not, in violation of FDA regulations.

141.    Defendants caused customers to purchase and consume this ultra filtered "honey," without those customers' knowledge or awareness that the product was not pure honey, but was instead, made from artificial sweeteners.

142.    Defendants' scheme enabled them to sell these aforementioned "honey" products at all, or at prices that were higher than they would otherwise be able to charge, if the products had been properly marked as illegally transshipped honey, adulterated honey, and/or made from a blend of artificial sweeteners.

143.    Defendants deprived Plaintiffs and the other Class members of sales that Plaintiffs and the other Class members would have made if the products had been properly marked with their true country of origin, adulteration status, or lack of pollen.

144.    Defendants, and possibly other co-conspirators, have exclusive access to the documents that memorialize each Defendant's scheme, including purchase orders, letters of credit, and shipping manifests.

145.    Defendants have exclusive access to documents that reflect the sale of unmarked or mismarked products within the United States and the profits it derived from those sales.

146.    Defendants have used false designations of origin and false representations to capture business, increase sales, and enhance profits.

147.     The mislabeled Chinese honey products have been bought and sold in both foreign and interstate commerce.   Communications and funds related to each Defendant's importation and sale of Chinese products have moved in foreign and interstate commerce.

148.     Plaintiffs and the other Class members – who are Defendants' direct competitors – have been damaged as a result of Defendants' false and misleading representations. Defendants have used false designations of origin and other false representations to capture business by purchasing products that were represented as legal honey at below fair value and selling those products as "honey" at a higher price (or at all) than they could obtain using accurate representations.  Plaintiffs and the other Class members were injured by declining sales, lost profits, loss of goodwill and other injuries.

149.     Additionally, Defendants' illegal scheme has deprived Plaintiffs and the other Class members of the benefits that they are entitled to receive under the Continued Dumping and Subsidy Offset Act of 2000 ("CDSOA") from duties imposed on Chinese honey.  Defendants' actions have violated 15 U.S.C. § 1125(a).

150.     Defendants' acts constituted a violation of the Lanham Act and entitle Plaintiffs, individually and on behalf of the other Class members, to recover Defendants' profits, three times the damages to each Class member, the costs of this action, and reasonable attorneys' fees.

**COUNT II**
**VIOLATION OF THE LANHAM ACT – UNFAIR COMPETITION**
**(15 U.S.C. § 1125(a))**

151.     Plaintiffs repeat and re-allege paragraphs 1-150 of this Complaint as if fully set forth herein.

152.     By purchasing "honey" products from Chinese producers knowing they have been transshipped and mislabeled and then causing such products to be imported into, sold in and

distributed throughout the United States, including this District, as alleged herein, each Defendant has used false designations of origin and false descriptions or representations to compete with Plaintiffs and the other Class members.

153.     In connection with their "honey" products, Defendants made false and misleading descriptions of fact.

154.     The Defendants' false and misleading descriptions of fact were likely to and did cause confusion, mistake, or deceived consumers as to the origin, content, and quality of Defendants' products.

155.     Defendants' false and misleading representations were material.

156.     Defendants' goods traveled in interstate commerce.

157.     Plaintiffs and the other Class members were injured by declining sales, lost profits, loss of goodwill, and other injuries.  Additionally, Plaintiffs and the other Class members have been deprived of the benefits that they are entitled to receive under the CDSOA from duties imposed on Chinese honey.

158.     Plaintiffs' and the other Class members' injuries were caused, in whole or in substantial part, by Defendants' acts of false advertising and unfair competition described herein.

159.     Defendants' acts constituted a violation of the Lanham Act and entitle Plaintiffs, individually and on behalf of the other Class members, to recover Defendants' profits, three times the damages to each Class member, the costs of this action, and reasonable attorneys' fees.

## COUNT III
## RICO VIOLATIONS

160.     Plaintiffs repeat and re-allege paragraphs 1-128 of this Complaint as if fully set forth herein.

161.     The Racketeering Influenced and Corrupt Organizations Act ("RICO") provides:

It shall be unlawful for any persons employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. 18 U.S.C. § 1962(c).

162.    The relevant time for Defendants' pattern of racketeering stems from at least the year 2006, and likely earlier but at this point in discovery as yet unknown, and is ongoing.

163.    Defendants are "person(s)" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

### The RICO Enterprise

164.    Defendants have used an association-in-fact "enterprise," within the meaning of 18 U.S.C. § 1961(4), to carry out their pattern of racketeering activity.

165.    This enterprise consists of Groeb (and Horizon), Honey Solutions, Alfred L. Wolff, Inc., and multiple suppliers of Chinese-origin honey ("Enterprise") and other entities involved in the illegal transshipment, mislabeling, and importation of mislabeled "honey" into the United States.

166.    This Enterprise possessed and continues to possess a common purpose and goal, a membership, organizational structure, and ongoing relationships between Defendants, Alfred L. Wolff, and other Chinese honey suppliers with sufficient longevity to permit and enable pursuit of the Enterprise's purpose and long-term objectives through a continuous course of conduct that affected and continues to affect interstate and foreign commerce.

167.    The Enterprise exists separate and apart from its pattern of racketeering activity, inasmuch as Defendants and the Enterprise have multiple goals, not all of which are fraudulent. The lawful activity engaged in by the Enterprise includes ongoing partnerships to purchase,

import, export, distribute, sell, and process food products that have entered the United States and are sold in the United States in compliance with U.S. and state laws.

168.    Since at least 2006, however, Defendants have used this Enterprise to conduct the related acts of mail and wire fraud comprising the pattern of racketeering alleged herein.

169.    Defendants are "person[s]" under the civil RICO statute because they knowingly and fraudulently conducted and participated in the conduct, the management, and the operation of the Enterprise's affairs, directly or indirectly, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

170.    Defendants engaged in such unlawful conduct by using the Enterprise to further its fraudulent scheme of causing false and misleading information to be disseminated by mail, interstate wires, or interstate carriers.

171.    Defendants sought to maximize their gain and profit through a pattern and practice of misrepresentation and concealment of the true origin of Chinese honey that was conducted in violation of applicable laws and regulations.

**The RICO Predicate Acts and Pattern of Racketeering Activity**

172.    Each Defendant has conducted, participated in, and operated its respective business through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). Each Defendant has done so with the purpose of evading the duties applicable to Chinese honey products, underselling domestically produced honey products, and enhancing its own profits.

173.    Defendants' fraudulent importation and sale of Chinese honey products have been part of a deliberately orchestrated scheme to enrich Defendants through increased sales of unmarked and mismarked honey products at the expense of competitors, including Plaintiffs and the other Class members.

43

174.    Each Defendant intended to profit from its sales of Chinese transshipped honey before its customers, the public, and the United States Government learned that the honey products had been falsely marked and fraudulently purveyed.

175.    Each Defendant carried out its respective scheme in interstate and foreign commerce, making extensive use of the United States interstate mail and wire services to orchestrate its fraudulent import transactions and promote its sales in the United States.

176.    In violation of 18 U.S.C. § 1001, and in furtherance of their respective unlawful transshipment schemes, each Defendant has repeatedly and systematically prepared fraudulent or false Customs entry declarations, invoices, affidavits, letters, and/or other papers that purposefully misstate the country of origin of Chinese honey products.

177.    In violation of 18 U.S.C §§ 542 and 545, each Defendant submitted the fraudulent or false documents to Customs officials, current and prospective customers, and end-users for the purpose of concealing the Chinese origin of honey products and introducing those products into interstate commerce.

178.    In violation of 18 U.S.C. § 1341, each Defendant, on more than two occasions during the last ten years, used the mails and the services of private or commercial interstate carriers in furtherance of schemes to defraud and to sell falsely marked Chinese honey products.

179.    Specifically, each Defendant mailed, to current and prospective customers, and to others for reproduction and distribution, solicitations or invoices for Chinese honey that affirmatively misstated, or that failed to state under circumstances that have a tendency to mislead, the Chinese origin of the goods.

180.    Each Defendant, and each Defendant's actual and prospective customers, has exclusive possession, custody, and control over the documents and other evidence reflecting the aforementioned mailings.

181.    In violation of 18 U.S.C. § 1343, each Defendant, on more than two occasions during the last ten years used the interstate and international wires to transmit purchase orders of its Chinese suppliers for unmarked or mismarked honey products.

182.    In violation of 18 U.S.C. § 1343, each Defendant, on more than two occasions during the last ten years, used the interstate and international wires to transmit instructions to its Chinese suppliers or intermediaries regarding the transshipment of unmarked or mismarked Chinese-origin honey products.

183.    In violation of 18 U.S.C. § 1343, each Defendant, on more than two occasions during the past ten years, used the interstate wires to transmit or convey quotations for Chinese honey products to customers, which fail to disclose the Chinese origin of these products.

184.    With the exception of the wire transmissions referenced herein, each Defendant, and each Defendant's actual and prospective customers, has exclusive possession, custody and control over most documents and other evidence reflecting the aforementioned wire transmissions.

## Relatedness and Continuity of the Racketeering Activity

185.    The foregoing enterprise existed and operated continuously since at least 2006 and likely going back much further.  The enterprise can be expected to continue indefinitely and engage in the same pattern of racketeering activity, unless this Court intervenes.

186.   Each Defendant's predicate acts have been so numerous and concerted as to establish the continuity necessary to constitute a pattern and practice of racketeering activity in furtherance of each Defendant's fraudulent scheme.

187.   Each Defendant's predicate acts are related, in that each act has been designed to further, and has been an integral part of, each Defendant's fraudulent scheme, and has been intended to achieve its unlawful purpose.

188.   The activities of the enterprise have had a significant impact upon interstate and foreign commerce; millions of dollars worth of mismarked or unmarked Chinese honey products have been manufactured outside of the United States and shipped in interstate and foreign commerce to reach each of Defendants' customers.

189.   Each Defendant's communications with and payments to the Chinese honey producers and their intermediaries have moved in interstate and foreign commerce.

190.   Each Defendant has derived substantial income from its wrongful conduct, as alleged herein.

191.   As set forth above, each Defendant and its respective affiliates have devised, set in motion, and brought to fruition fraudulent schemes, namely: willfully and knowingly misrepresenting material facts regarding the character, quality and origin of Chinese honey products for the purpose of inducing the U.S. Customs Service to believe that the imports were not of Chinese origin.

192.   Consumers, purchasers, the federal government and other third parties relied on Defendants' fraudulent scheme thus causing financial harm to Plaintiffs and the other Class members.

193. Plaintiffs and the other Class members have been damaged by each Defendant's mailing or wire transmissions of solicitations that fail to disclose the Chinese origin of Defendant's honey products. Plaintiffs and the other Class members suffered declining sales, lost profits, loss of goodwill, and other injuries.

194. Additionally, Plaintiffs and the other Class members have been deprived of the benefits that they were entitled to receive under the CDSOA from duties imposed on Chinese honey.

## VIII. <u>RELIEF REQUESTED</u>

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A. Declaring that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, direct that reasonable notice of this action, as provided by Rule 23 of the Federal Rules of Civil Procedure, be given to all Class members, certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing their undersigned counsel as Class Counsel;

B. That Defendants' false and misleading statements and patterns of deceptive practices alleged herein be adjudged as violations of the Lanham Act and the RICO Act;

C. That Plaintiffs and each of the other Class members recover their damages, the disgorgement of Defendants' profits, three times their damages, as provided by law, and that judgments in favor of Plaintiffs and the other Class members be entered against Defendants;

47

D. That Plaintiffs and the other Class members recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

E. That Plaintiffs and the other Class members be granted such other equitable, further, and different relief as the nature of the case may require or as may be deemed just and proper by this Court.

## IX.  JURY DEMAND

195. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

Dated:  April 18, 2013

Respectfully submitted,


/s/ Adam J. Levitt_____
Adam J. Levitt (ARDC #6216433)
Edmund S. Aronowitz (ARDC #6304587)
**GRANT & EISENHOFER P.A.**
30 North LaSalle Street, Suite 1200
Chicago, Illinois  60602
Tel:  (312) 214-0000
Fax:  (312) 214-0001
alevitt@gelaw.com
earonowitz@gelaw.com

James J. Pizzirusso*
Kristen M. Ward*
**HAUSFELD, LLP**
1700 K Street N.W. Suite 650
Washington, D.C.  20006
Tel: (202) 540-7200
Fax: (202) 540-7201
jpizzirusso@hausfeldllp.com
kward@hausfeldllp.com

Kenneth B. Bell*
**CLARK, PARTINGTON, HART,**
**LARRY, BOND & STACKHOUSE**
125 West Romana Street, Suite 800

Pensacola, Florida 32502
Tel: (850) 208-7025
Fax: (850) 432-7340
kenbell@cphlaw.com

Stephen Echsner*
E. Samuel Geisler (ARDC# 6305996)
**AYLSTOCK, WITKIN, KREIS &**
**OVERHOLTZ PLLC**
17 East Main Street, Suite 200
Pensacola, Florida 32502
Tel: (850) 202-1010
Fax: (850) 916-7449
sechsner@awkolaw.com
sgeisler@awkolaw.com

Daniel E. Gustafson*
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, Minnesota 55402
Tel: (612) 333-8844
Fax: (612) 339-6622
dgustafson@gustafsongluek.com

*Counsel for Plaintiffs and the Class*

(*Pro hac vice applications to be submitted)